UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

YUSEF LATEE WILLIAMS,

       Plaintiff,

v.               Case No. 10-CV-981-JPS

STEVEN SCHUELER,
C.O. II SCHLIEVE, C.O. III D. MAYS,
and BELINDA SCHRUBBE,
                 ORDER

       Defendants.

  The plaintiff, Yusef Latee Williams ("Williams"), a Wisconsin state prisoner, filed this civil rights actions pursuant to 42 U.S.C. § 1983. He alleges that he was denied food for 48 hours, in violation of the Eighth Amendment to the United State Constitution. The defendants have filed a motion for summary judgment, which will be addressed herein.

1.  Summary Judgment Standard

  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Ames v. Home Depot U.S.A., Inc.*, 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

  A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: "(A) citing to particular parts of materials in the

record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

2. Facts[1]

    2.1    Parties

Williams is a Wisconsin Department of Corrections ("DOC") inmate who was incarcerated at Waupun Correctional Institution ("WCI") at all times relevant to this action. Defendant Steven Schueler ("Schueler") was assigned to the WCI Health & Segregation Complex as the Segregation Captain at all times relevant, where he worked on a daily basis. Defendant Belinda Schrubbe ("Schrubbe") is employed by the DOC as the Health Services Manager of the Health Services Unit ("HSU") at WCI. Defendant Dennis Mays ("Mays") was a Correctional Sergeant at WCI at all times relevant, and was generally responsible for the security, custody, and control of inmates in a particular area on his assigned shift. Mays also acted as a lead worker and provided direction for correctional officers on his assigned shift. Defendant Clint Schlieve ("Schlieve") was employed by the DOC as a

---

[1] This section is taken from the Defendants' Proposed Findings of Fact, the Plaintiff's Proposed Findings of Fact, and the sworn complaint.

Correctional Officer at all times relevant. He typically worked at the WCI Health & Segregation Complex to assist only with passing out noon meal trays to inmates.

    2.2      Placement on Observation in Health & Segregation Complex

The Health & Segregation Complex is a separate building at WCI, which houses offenders who have been assigned a segregated status, such as adjustment segregation, program segregation, disciplinary separation, controlled segregation, temporary lock up, protective confinement, or observation status. It is used for temporary confinement of an inmate to ensure the inmate's safety and safety of others due to mental illness or medical problems.

During the time period that Schueler worked at WCI, inmates who were assigned a segregated status were transferred into the Health & Segregation Complex and provided with a Segregation Handbook. The purpose of the handbook was to provide inmates with information so they had a clear understanding of the rules in the Health & Segregation Complex, and included a section titled "MEALS." Meals were served regularly in the Health & Segregation Complex, at the following approximate times: Breakfast at 6:30 a.m.; Noon meal at 10:30 a.m.; and Evening meal at 3:30 p.m. Also, according to the Handbook, an announcement was made on the intercom system as to when the meal trays or snack bags were being distributed, and all inmates residing in the Health & Segregation Complex were required to be dressed to receive a meal tray or snack bag, were required to have their cell lights on, and to stand at the cell door to receive the meal tray.

Page 3 of 13

Case 2:10-cv-00981-JPS   Filed 03/27/13   Page 3 of 13   Document 67

WCI inmates who were assigned an observation status resided in the Health & Segregation Complex. Observation status was used for the temporary, non-punitive confinement of an inmate to ensure the inmate's safety and safety of others if the inmate was mentally ill and dangerous, dangerous to himself, had a medical problem that required separation from the population for treatment, or refused testing for a communicable illness. Typically, WCI inmates were placed on medical observation status because they refused a tuberculosis skin test and were waiting for a physician to examine and evaluate their medical status.

On May 15, 2006, Williams was seen by a nurse in the WCI HSU, and he refused the tuberculosis PPD Skin Test.[2] On May 16, 2006, the WCI HSU directed that Williams be placed in medical observation, and a copy of the notification was sent to the WCI Security Office. Schueler, as Captain, would have been informed of this placement.

All WCI inmates, including Williams, who were placed on a medical observation status, were restricted from movement outside of the cell unless going to see medical staff and they were required to wear a mask outside of their cells. Correctional staff informed inmates that they must wear the mask upon leaving the cell. The parties dispute whether there was a requirement that inmates wear masks while inside their cells.

---

[2] Tuberculosis is an air-borne, communicable disease, and all DOC inmates are required to be screened for signs and symptoms of tuberculosis on an annual basis. DOC inmates are offered a tuberculosis skin test, which is also known as the PPD Skin Test, on an annual basis. The PPD Skin Test is used to determine if a person has developed an immune response to the bacterium that causes tuberculosis.

The defendants assert that Williams was not served meals for 48 hours because he refused to comply with the rule that he wear a mask upon delivery of his meals. Williams, on the other hand, asserts that he was not aware of such a rule and that, even if he had known of the requirement, he did not have a mask in his cell.

Typically, the same correctional officers on duty on any given shift were the officers who delivered the breakfast, noon, and evening meals, although leave time and changes in schedules could have affected which staff delivered the meal trays on a day-by-day basis. First shift correctional staff typically delivered the breakfast and noon meals, and second shift correctional staff typically delivered the evening meals. All correctional staff had been trained and instructed that if they became aware that an inmate missed three full days without meals, they should write an incident report, or contact supervisory staff on the unit.

Correctional staff assigned the task of delivering meal trays were required to look into the cell windows and ensure that inmates were in compliance with the rules to receive a meal tray. If the inmate refused to get dressed, stand at his cell door with the lights on, and/or put his mask on (if required), such actions constituted refusal of a meal tray, which the inmate is entitled to do. It was standard security practice that correctional staff not open a cell door or the cell trap door of any inmate assigned to a medical observation status unless the inmate was wearing a mask. Inmates housed in the Health and Segregation Complex were oftentimes subject to various restrictions, which were used as a management tool to maintain order and to address security and treatment concerns. The restrictions were posted on the outside of the inmate's cell door using magnets.

### 2.3 Missed Meals

After Williams was placed on observation on May 16, 2006, he received his meals regularly until May 24, 2006, when, without explanation, he was not given breakfast. Williams received lunch that day, but when he asked for pepper for his food, the guard, Schlieve, stated, "you're lucky you even got a food tray, I forgot." (Williams Aff. ¶ 4.) Schlieve recalls that he inadvertently opened Williams' cell trap door and gave him a noon meal tray on May 24, 2006, while Williams was not wearing a mask, and that Williams requested pepper on his food after the meal tray had been delivered. According to Schlieve, inasmuch as he then realized that Williams should not have received a noon meal tray because he was not wearing a mask, he did not feel it was appropriate to shake pepper on his food. (Schlieve Aff. ¶ 9.)

Over the next 48 hours, the guards withheld meals from Williams six consecutive times until dinner on May 26, 2006. Specifically, Williams alleges that on May 25, 2006, Schlieve refused to deliver him a lunch meal tray. He also alleges that on May 26, 2006, Mays refused to give him a lunch meal tray. Williams further alleges that on May 26, 2006, Mays opened his cell trap door to pick up his meal tray, knowing that he did not have a meal tray. Williams avers that Mays, although fully aware that Williams had not received food, asked him for his meal tray, then laughed and slammed the cell door. (Williams. Aff. ¶ 7.) Mays avers that he does not specifically recall what occurred on May 26, 2006, but he denies laughing at Williams.

According to Williams, moments after the interaction with Mays, Schueler visited his cell and explained to Williams for the first time that he could not receive any meals unless he was wearing a surgical mask because he was suspected of having tuberculosis. Schueler then asked Williams if he

Page 6 of 13

Case 2:10-cv-00981-JPS   Filed 03/27/13   Page 6 of 13   Document 67

would wear a surgical mask to go out of his cell to see the nurse, and Williams consented. Then, in Schueler's presence, a mask was brought to Williams. He went to see Nurse Gorske who took him off of medical observation. Because Williams was off of medical observation, he was not required to wear a surgical mask prior to receiving his dinner on May 26, 2006. Williams was given his dinner on May 26, 2006.

Williams submitted a grievance to the Inmate Complaint Examiner, Complaint Number WCI-2006-18152, and the Inmate Complaint Examiner contacted Schueler. In his grievance, Williams complained that Mays and Sgt. Reese refused to give him a meal tray on May 26, 2006, and that Mays opened his cell trap door to ask for the return of the meal tray, when he knew a meal tray had not been delivered. Schueler informed the examiner of Williams' unwillingness to comply with the procedures in the segregation unit, which required him to wear a mask while in medical observation status. (Schueler Aff. ¶ 25; Muenchow Aff. ¶ 9, Exh. 1002 at 4, 11.) However, according to Williams, Schueler never told him he had to wear a mask in his cell. Williams further states that he was not unwilling to comply with procedures in the segregation unit and did in fact comply with all the procedures. On May 26, 2006, at 1:00 p.m., Williams was seen by Nurse Practitioner Gorske for refusal of the PPD Skin Test. The progress note dated May 26, 2006, written by Nurse Practitioner Gorske indicated that Williams denied any chronic or acute cough, hemoptysis (coughing up blood), night sweats or weight loss. It did not indicate that Williams complained of not receiving all of his meals during the time he spent on medical observation status and also did not indicate that Williams complained of emotional

distress and/or mental anguish related to his not receiving all of his meals during the time he spent on medical observation status.

Schrubbe was not directly and personally involved in the determination to place Williams on medical observation status from May 16, 2006, through May 26, 2006. But, it is standard medical practice at WCI to place inmates who refuse the PPD Skin Test in medical observation until they can be evaluated for symptoms associated with tuberculosis. Schrubbe told Schueler that Williams must wear a mask when the cell trap door or the cell door was open.

Schrubbe did not order or direct security staff working in the Health & Segregation Complex not to give Williams his meal trays, nor does she have the authority to make such an order. Schrubbe was not aware of Williams' allegations that he had not received certain meals for refusing to wear a mask during his medical observation status from May 16, 2006, through May 26, 2006. Schrubbe received a Health Services Request signed by Williams on June 5, 2006, and by that time, he had been released from medical observation status. Williams did not inform the HSU that he did not receive all of his meal trays during his stay on medical observation in May 2006.

Williams' height is 6'0". On May 27, 2005, his weight was recorded as 193.5 pounds. On May 26, 2006, approximately one year later, nursing staff recorded his weight as 231 pounds, which shows that he gained 38.5 pounds in one year.

According to Williams, the deprivation of food for 48 hours produced extreme physical discomfort in the form of hunger pains, stomach cramps, and headaches. It also produced emotional pain in the form of frustration

with not being fed, and the fear that not being fed would last long enough to produce unconsciousness, organ failure, or death. Williams did not know when, if ever, he would be fed again.

3.   Analysis

The defendants contend that they are entitled to summary judgment because Williams cannot establish that he suffered any serious injury, because he refused to comply with a reasonable condition of being fed, and because he cannot meet his burden of demonstrating the defendants had the requisite subjective intent. The defendants also contend that Schrubbe lacked personal involvement. Finally, they contend that they are entitled to summary judgment on Williams' claims of compensatory and punitive damages.

Williams argues that the defendants are not entitled to summary judgment because he can establish that he suffered a serious injury, because he was never given a mask or told he had to wear a mask as a condition of receiving food, and because he has asserted facts which support his Eighth Amendment claim that the defendants had the requisite subjective intent. Williams also contends that Schrubbe should not be dismissed for lack of personal involvement. He finally contends that he is entitled to both compensatory and punitive damages.

An Eighth Amendment deliberate indifference claim has both objective and subjective elements. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). First, an inmate must establish that he suffered a deprivation sufficiently serious to have denied him "the minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981); *see Farmer*, 511 U.S. at 834; *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011). Under the Eighth

Amendment, prison officials have a duty to provide humane conditions of confinement, including ensuring that inmates receive adequate food. *Farmer*, 511 U.S. at 832; *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009). Withholding food from prisoners is a deprivation of a basic need that in some circumstances will satisfy the objective aspect of the *Farmer* test. *See Atkins v. City of Chicago*, 631 F.3d 823, 830 (7th Cir. 2011) ("Depriving a person of food for four days would impose a constitutionally significant hardship."); *Foster v. Runnels*, 554 F.3d 807, 812-13 (9th Cir. 2009) (concluding that denial of 16 meals in 23 days was sufficient to support claim of deliberate indifference); *Reed v. McBride*, 178 F.3d 849, 853-54 (7th Cir. 1999) (concluding that the first *Farmer* element was satisfied by allegation that infirm inmate was denied food for three to five days); *Simmons v. Cook*, 154 F.3d 805, 808 (8th Cir. 1998) (concluding that denial of four consecutive meals was a sufficiently serious deprivation).

In this case, the defendants contend that Williams cannot establish a sufficiently serious deprivation because he cannot prove he suffered any real physical consequences from food deprivation. However, Williams avers that the 48-hour food deprivation caused him extreme physical discomfort in the form of hunger pains, stomach cramps, and headaches. The defendants also contend that the food deprivation was Williams' fault because he refused to comply with a reasonable condition of being fed. However, the facts germane to this claim are in dispute. According to Williams, he was never given a mask or told he had to wear a mask as a condition for receiving his meals. Williams' claims could support a finding that Williams was denied food for 48 hours for an unknown reason and that, when he asked why, he was not given an answer. His claims could further support a finding that Williams

suffered physical consequences as a result of the denial of food. The defendants, therefore, cannot prevail on summary judgment based on Williams' inability to show the objective prong of an Eighth Amendment claim. *See Farmer*, 511 U.S. at 834.

To satisfy the second element of an Eighth Amendment claim, an inmate has to show that the defendants were subjectively aware that their conduct was creating a substantial risk of serious harm. *Farmer*, 511 U.S. at 834, 837; *Roe*, 631 F.3d at 857. The defendants contend that Williams cannot meet his burden of showing that they had the requisite subjective intent because there is no evidence that the defendants acted with deliberate indifference in implementing and/or enforcing the food policy, and because the officers were merely following a food policy which they were required to do. Williams contends that the defendants did act with deliberate indifference because he was never given a mask and never told he had to wear one, yet denied food for 48 hours based on failure to wear a mask. He also points to Mays' alleged laughter when he came to collect a food tray that he knew was not there. Additionally, Williams avers that at each meal time he asked why he was being passed by, and was met with silence. The parties also dispute whether there was a notice on the outside of Williams' cell that he was required to wear a mask; the defendants say there must have been one because the mask requirement was in place for Williams, but Williams asserts that when he left his cell on May 26, 2006, he checked and a notice was not there. "The risk that a prisoner might suffer harm as a result of repeatedly being denied meals is sufficiently obvious to permit the inference that the guards were aware of a risk." *Williams v. Schueler*, 436 Fed. Appx. 687, 689 (7th Cir. 2011) (unpublished) (citations omitted). Based on the

factual disputes, a reasonable fact-finder could conclude that Williams suffered a serious deprivation and that the defendants acted with deliberate indifference.

Next, the defendants contend that Schrubbe should be dismissed for lack of personal involvement. The record shows that Schrubbe informed Schueler that Williams was required to wear his mask when his cell trap door was open, and that it was HSU's responsibility to inform Williams that he was required to wear the mask to receive food. According to Williams, since Schrubbe was head of the HSU, her failure to act to inform him of the rule caused Williams to be deprived of food for 48 hours and subjected him to a serious risk of harm. However, it is undisputed that Schrubbe did not order staff not to give Williams his meals tray and that she was not aware that he had not received his meals for the 48 hour period. At most, plaintiff has shown that Schrubbe was negligent in that she failed to ensure that he knew of the mask requirement. This showing is inadequate to survive defendants' motion because negligent conduct is insufficient to make out a constitutional violation. *Daniels v. Williams*, 474 U.S. 327, 331, 333-34 (1986); *Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986); *Russ v. Watts*, 414 F.3d 783, 788-89 (7th Cir. 2005). Accordingly, Schrubbe will be dismissed from this lawsuit.

Finally, the defendants contend that they are entitled to summary judgment on Williams' claims for compensatory and punitive damages because, respectively, he did not suffer physical injury and cannot show that the defendants were motivated by any intent to harm Williams or that they acted with reckless or callous indifference. However, as discussed *supra*, Williams does aver that he suffered physically and the question of deliberate indifference is at issue in this case. Though they are by no means guaranteed,

Williams' claims for relief for compensatory and punitive damages may proceed.

Accordingly,

IT IS ORDERED that the defendants' motion for summary judgment (Docket # 45) be and the same is hereby GRANTED in part and DENIED IN PART as described herein;

IT IS FURTHER ORDERED that defendant Belinda Schrubbe be and the same is hereby DISMISSED; and

IT IS FURTHER ORDERED that a status conference will be held in Courtroom 425 of the United States Courthouse, 517 East Wisconsin Avenue, Milwaukee, Wisconsin, at 8:45 A.M. on Thursday, April 11, 2013, to determine whether this case will be settled, referred to mediation, or set for jury trial.

Dated at Milwaukee, Wisconsin, this 27th day of March, 2013.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge